FILED

2004 FEB 20 P 1:33

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| CHRISTOPHER COURNOYER,<br>*plaintiff,* | : | NO. 3:01CV-0221 (AWT) |
| | : | |
| V. | : | |
| | : | |
| NEVERILL COLEMAN, *et al.,*<br>*defendants.* | : | JANUARY 14, 2004 |

### AMENDED STATEMENT OF MATERIAL FACTS AND LOCAL RULE 9(C)(1) STATEMENT IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 9(c) of the Local Rules of Civil Procedure, the below named defendants respectfully offer the following statement of material facts in support of the motion for summary judgment.

1. The defendant, Neverill Coleman, is employed by the State of Connecticut, Department of Public Safety, Division of State Police. At all times relevant to this lawsuit, Neverill Coleman was a detective assigned to the Troop C (Tolland) Criminal Investigations Unit of the Eastern District Major Crime Squad. *See* Complaint, ¶ 4.

2. The defendant, Harold Shaw, is employed by the State of Connecticut, Department of Public Safety, Division of State Police. At all times relevant to this lawsuit, Harold Shaw was a detective assigned to the Troop C (Tolland) Criminal Investigations Unit of the Eastern District Major Crime Squad. *See* Complaint, ¶ 4.

3. On Sunday, March 1, 1998, at about 8:00 p.m., Detective Coleman was assigned to investigate a shooting which occurred in a vehicle traveling along Horse Hill Road near the intersection of North Road in Ashford, Connecticut. The incident was reported to Troop C at 7:40 p.m. by Wayne Fletcher, the local Deputy Fire Chief, who happened to be driving down

Horse Hill Road that evening when he observed the victim, Ronald Vancelette, walking along the road, dragging his right leg, and screaming that he had been shot. He rendered first aid and radioed for an ambulance. Mr. Vancelette was brought to Windham Community Memorial Hospital where he was treated for his injuries. *See* Affidavit of Det. Coleman, ¶ 3.

 4. Detective Coleman responded to the hospital where he first spoke with the victim, Ronald, Vancelette. Ronald initially told Detective Coleman he had been jogging in Webster, Massachusetts, when a car approached him and asked for directions. Ronald stated that a guy in the back seat pulled him into the car and began pistol whipping him while the driver said "Do him, do him!" Ronald said he was shot in the hip when he jumped out of the car. Detective Coleman told Ronald that he did not believe his story because he did not look like a person who went jogging, and the sneakers he was wearing were not jogging shoes. This interview ended abruptly when Ronald was taken away to have a CT Scan performed. After Ronald left, Detective Coleman spoke with Ronald's brother, Joseph Vancelette. Joseph told Detective Coleman that he had dropped his brother off at a house on Route 21 in Thompson, Connecticut, so he could collect some money owed to him from some guy. Joseph remembered a black Chevrolet Camaro parked in the driveway. Joseph told Detective Coleman that he believed that the person who shot Ronald is the same person who chased him (Joseph) that evening driving a newer model, red Pontiac Grand Prix while waving a gun at him. Detective Coleman told Joseph that Ronald was not being truthful in telling him what had occurred, and asked Joseph to speak with Ronald and ask him to tell them exactly what happened. Joseph said he would, and told Detective Coleman that Ronald was afraid for himself and his family. *See* Affidavit of Det. Coleman, ¶ 3.

5. On Monday, March 2, 1998, Detective Coleman obtained a written statement from Ronald Vancelette. Ronald stated that, on the previous evening, at about 4:00 p.m., his brother, Joseph Vancelette, picked him up at his apartment in Webster, Massachusetts. Ronald told Detective Coleman that he was dropped off by his brother on Route 21 in Thompson, Connecticut, at a home occupied by an individual known as Scott Cournoyer. Ronald stated that he was not sure what time he was dropped off by his brother, but that it was a twenty minute drive between the two locations. According to Ronald, he had gone to Scott Cournoyer's home to collect some money, which was owed to him. Ronald stated that he never met Scott Cournoyer, but knew of him through a friend. Ronald told Detective Coleman that Scott was not at home, so he waited outside along Route 21 for a couple of hours for his brother to return to pick him up. *See* Affidavit of Det. Coleman, ¶ 4.

6. Ronald told Detective Coleman that while he was waiting, a red, four door, Pontiac Grand Prix pulled up next to him and the occupants asked him if he wanted a ride. Ronald said "yes" and got into the back seat behind the driver. Ronald told Detective Coleman that he did not recognize the front seat passenger, and that he did not get a good look at the driver. Ronald told the driver he was going to Webster, Massachusetts. Upon hearing this, the driver turned the car around and began to head in the opposite direction. When questioned about this, the driver said he was going to the highway. *See* Affidavit of Det. Coleman, ¶ 5.

7. Ronald then told Detective Coleman that the front seat passenger climbed over the seat into the back and began to hit him on the head with a gun asking, "Who broke into my gym?" Ronald told Detective Coleman that once the passenger asked this question, he knew it was Scott Cournoyer because Scott's gym had been broken into. Ronald told Detective Coleman

3

that while this was going on, the driver was saying, "Do him, do him!" which Ronald understood to mean as to kill him. *See* Affidavit of Det. Coleman, ¶ 6.

8. Ronald told Detective Coleman that he then opened the left rear door of the car and jumped out while it was moving. Ronald told Detective Coleman that, as he did so, Scott Cournoyer shot him in the stomach. Ronald gave Detective Coleman a signed, written statement including this information. *See* Affidavit of Det. Coleman, ¶ 7.

9. Later on March 2, 1998, Detective Coleman obtained a second statement from Ronald Vancelette. This statement reflected the fact that Ronald had identified photo #1 (Scott Cournoyer) from an array of eight photos as being that of the man who shot him the previous day. *See* Affidavit of Det. Coleman, ¶ 8.

10. On Monday, March 2, 1998, Trooper Stevens of the Connecticut State Police obtained a signed statement from Ronald's brother, Joseph Vancelette. Joseph stated that at about 5:30 p.m. on Sunday, March 1, 1998, Ronald asked him to drive him over to Scott Cournoyer's house in Thompson, Connecticut so that he could collect some money. Joseph did not tell Trooper Stevens where he and Ronald were when this request was made. He did say that on the way to Scott Cournoyer's house, they drove south on Interstate 395 and got off at Exit 99. Joseph stated that he dropped his brother off at a house behind a gun shop on Route 21 in Thompson, Connecticut. While leaving the area, Joseph stated he saw a red Grand Prix Wide Track, late 90's model, drive past him in the direction of Scott Cournoyer's house. Joseph stated that he continued on and stopped at a Wendy's restaurant to get something to eat at the drive-thru window. Joseph did not state how long he remained at the Wendy's restaurant. Joseph stated

4

that he then went back to where he dropped off Ronald and saw the same red Grand Prix parked in the driveway of the home with its lights off. *See* Affidavit of Det. Coleman, ¶ 9.

11. Joseph stated that as he drove past the driveway, the headlights of the red Grand Prix came on. He stated the car then began to follow him on local roads toward the highway. Joseph stated that he then got onto Interstate 395 northbound, followed by the Grand Prix which then tried to run him off the road. Joseph stated that he got off the highway at Exit 99, and got right back on, but the Grand Prix continued to follow him. *See* Affidavit of Det. Coleman, ¶ 10.

12. Joseph stated that he accelerated to between 90-100 mph and the Grand Prix pulled next to him on the highway. Joseph stated that he could see the driver. Joseph described him as a white male with dark hair, maybe with a goatee and moustache, in his early to mid thirties. He told Trooper Stevens that he did not know how long the driver's hair was. He said the driver yelled, "Pull over!" while waving a gun up high with his left hand. Joseph described the gun as a stainless steel, .380 semi-automatic, about three inches long. Joseph stated that he was afraid for his life. He said he got off the highway at Exit #4 in Massachusetts and pulled behind an Oxford, Massachusetts police officer. Joseph stated that the Grand Prix stopped following him at that point. Joseph told Trooper Stevens he went back in a different car to the area where he dropped off his brother, but couldn't find him. Joseph told Trooper Stevens that he then went home. He received a telephone call from his brother's girlfriend at about 11:00 p.m. that night telling him that his brother had been shot. *See* Affidavit of Det. Coleman, ¶ 11.

13. On March 14, 1998, Detective Coleman took a second statement from Joseph Vancelette. This time Joseph told Detective Coleman that he picked up his brother Ronald, along with Alan Stately, at about 11:30 a.m. on Sunday morning, March 1, 1998. He said that

the three men drove around looking for a pickup football game. Joseph told Detective Coleman that the three men went to the Putnam Intermediate School at about 3:30 p.m. to play basketball, and stayed there until about 5:30 p.m. Joseph said he then dropped his brother off at a house on Route 21 in Thompson, Connecticut, and left. He stated that he arrived at a Burger King Restaurant at about 5:45 p.m. and bought some hamburgers to eat. Joseph did not tell Detective Coleman how long he remained at Burger King. Joseph stated that he then drove back to where he had dropped his brother off, and found him standing at the end of the driveway. Joseph stated that Ronald told him the guy had not showed up yet, and to come back later. As he was leaving, he saw a red car pull into the driveway where Ronald had been standing. Joseph stated that he then turned around and went back, but couldn't find his brother. Joseph stated, after that, everything happened just as he had said in his first statement. *See* Affidavit of Det. Coleman, ¶ 12.

14. Detective Abrams dispatched a trooper to go to the house on Route 21 in Thompson, Connecticut, at which Joseph said Ronald Vancelette was dropped off to verify who lived there. The trooper obtained a registration plate from a vehicle parked at the house at 240 Country Home Road and determined that the vehicle was registered to Scott Cournoyer. A criminal records check on Scott Cournoyer revealed a lengthy criminal record in Massachusetts, including narcotics and firearms related offenses. *See* Affidavit of Det. Coleman, ¶ 13.

15. On Monday, March 2, 1998, Sergeant Shemansky, Detective Abrams, Trooper Aiello and Detective Coleman contacted Donald Brown of the Koinania School of Sport located at 240 Country Home Road in Thompson, Connecticut. Mr. Brown informed the detectives that Scott Cournoyer rented a house from him at 240 Country Home Road, and that he recently saw Roger

6

Cournoyer driving his brother Scott Cournoyer around in a red Pontiac Grand Prix. *See* Affidavit of Det. Coleman, ¶ 3. *See* Affidavit of Det. Coleman, ¶ 14.

16. On Monday, March 2, 1998, Sergeant Shemansky, Detective Abrams, Trooper Aiello and Detective Coleman also spoke with Benjamin Kondysar, the caretaker of the grounds at the Koinania School of Sports. Mr. Kondysar told the detectives that he recorded the registration plate on the red Pontiac Grand Prix he saw Scott Cournoyer driving. Mr. Kondysar gave the plate as Massachusetts registration 648-8BV. Further investigation revealed that this plate was registered to Enterprise Rental Cars of Massachusetts on a red Pontiac Grand Prix. *See* Affidavit of Det. Coleman, ¶ 15.

17. On that same afternoon, Sergeant Shemansky, Detective Abrams, Trooper Aiello and Detective Coleman spoke with James Northridge. Mr. Northridge owns a hardware store located at 963 Riverside Drive in Thompson, Connecticut. He told the detectives that Scott Cournoyer was renting a store right next to his, and that Scott was trying to open up a weight lifting gym. Mr. Northridge stated that the last time he saw Scott, he was driving a red Grand Am with Massachusetts registration plates on it. *See* Affidavit of Det. Coleman, ¶ 16.

18. On Tuesday, March 3, 1998, Detective Coleman spoke with Jennifer Pineo of Enterprise Rental Cars in Auburn, Massachusetts. Ms. Pineo told Detective Coleman that her records indicated that Scott Cournoyer had rented a red Pontiac Grand Prix on February 13, 1998, and that the car was dropped off at the Auburn, Massachusetts, office while it was closed overnight sometime between 7:00 p.m. on March 1, 1998, and 7:00 a.m. on March 2, 1998. Ms. Pineo informed Detective Coleman that Christopher Cournoyer was listed as the second driver

on the rental contract, and that Christopher came into the office at about 10:00 a.m. on March 2, 1998, and paid the rental fee of $895.00 in cash. *See* Affidavit of Det. Coleman, ¶ 17.

19. Detective Coleman obtained an arrest warrant for Scott Cournoyer. Detective Harold Shaw and Detective Coleman attempted to locate both Scott and Christopher without any success throughout the first week of March, 1998. Scott turned himself in at Troop D (Danielson) on Thursday evening, March 5, 1998. At the time he was arrested, Scott invoked his right to remain silent upon the advice of his attorney. Consequently, Detective Coleman was prevented from interviewing him about what had occurred, or about Christopher's role, if any, in the shooting. Before he invoked his right to remain silent, however, Scott spoke verbally with Detective Sarant of the Connecticut State Police. Detective Sarant told Detective Coleman that Scott had told him that he was at dinner with friends, Sue Reipold and Bill Robinson, at their home in Miller's Falls, Massachusetts at 6:00 p.m. on March 1, 1998, and that they had pot roast for dinner. *See* Affidavit of Det. Coleman, ¶ 18.

20. On Friday, March 6, 1998, Detective Harold Shaw and Detective Coleman met with Ms. Reipold and Mr. Robinson at their home at 257 Wendell Road, Miller's Falls, Massachusetts. Mr. Robinson told the detectives that he had received a telephone call from Scott Cournoyer sometime after 8:00 p.m. on Sunday, March 1, 1998. Mr. Robinson told the detectives that Scott had said, "If anyone calls, say I was there between 6:00 p.m. and 8:00 p.m. on Sunday night." Scott asked what Mr. Robinson had for dinner. Mr. Robinson told him "pot roast." When Mr. Robinson asked Scott why, Scott said, "Don't worry about it." Mr. Robinson told the detectives that Scott Cournoyer was not present for dinner in his home on March 1, 1998. *See* Affidavit of Det. Coleman, ¶ 18.

8

21. On Wednesday, March 11, 1998, at about 12:20 p.m., Joseph Vancelette came to Troop C at Detective Coleman's request. Detective Coleman showed Joseph Vancelette a photo line-up and asked him if he could identify the driver of the red Pontiac Grand Prix he had described in his statement. Joseph was unable to identify any of the photos as the driver of that vehicle. Detective Coleman tried to construct a composite photo of the driver with Joseph, but also failed. Detective Coleman then escorted Joseph to the lobby at about 1:30 p.m. and said goodbye to him. *See* Affidavit of Det. Coleman, ¶ 19.

22. On Wednesday, March 11, 1998, at about 2:00 p.m., Scott's brother, Christopher Cournoyer, came into Troop C at Detective Coleman's request. He was accompanied by his lawyer, Attorney Arthur Meisler. Detective Coleman had previously spoken with Attorney Meisler on Friday, March 6, 1998, by telephone. Attorney Meisler had informed Detective Coleman by telephone on Friday, March 6, 1998, that his client was at the Mohegan Sun Casino on the afternoon of March 1, 1998, and that he was attempting to obtain paperwork from the casino which would prove this claim. Following his arrival at Troop C on Wednesday, March 11, 1998, Christopher told Detective Coleman that he was at the Mohegan Sun Casino on Sunday, March 1, 1998. Christopher gave Detective Coleman a photocopy of a win/loss statement for account #012152278. The statement indicated that Christopher started playing blackjack at 3:57 p.m. for a period of one hour and thirty-eight minutes, until 5:35 p.m. Christopher Cournoyer also told Detective Coleman that he spent six dollars and fifty cents at one of the casino restaurants before leaving that afternoon. *See* Affidavit of Det. Coleman, ¶ 20.

23. Christopher told Detective Coleman that he lived at 109 County Road in Eastford, Connecticut. He told Detective Coleman that on his was home from the casino, he stopped at a

9

Dunkin Donut shop in Putnam, Connecticut, and arrived home at about 7:30 p.m. Christopher told Detective Coleman that he stayed home the remainder of the evening, put up some window blinds, and then turned on his television set and watched the movie "Contact" starring Jodie Foster on HBO beginning at 8:00 p.m. Christopher told Detective Coleman that he subscribed to Charter Communications Cable Co., and that he did not order any pay-per-view channels that day. Christopher told Detective Coleman that he did not drop off the red Pontiac at the rental company that night. Detective Coleman told Christopher that his brother Scott had told him that it was Christopher who dropped off the rental car that night, and that one of them was lying. Christopher replied, "A lie is not a lie until you swear to it." Christopher Cournoyer did not reduce his oral explanation of his activities to a sworn, written statement. *See* Affidavit of Det. Coleman, ¶ 21.

24. While at the barracks on Wednesday, March 11, 1998, Christopher Cournoyer permitted Detective Coleman to take a Polaroid photograph of him. On the following day, March 12, 1998, Detective Coleman used that photo along with seven others to construct a photo line-up. *See* Affidavit of Det. Coleman, ¶ 22.

25. On Saturday, March 14, 1998, both Joseph and Ronald Vancelette came to Troop C at Detective Coleman's request. Ronald waited in the lobby while Detective Coleman showed a photo array to Joseph. Upon viewing the array, Joseph picked out photo #6 as depicting the driver of the red Pontiac Grand Prix. This was Christopher Cournoyer's photo. After identifying the photograph of Christopher Cournoyer, Joseph told Detective Coleman that he had seen Christopher walk into the Troop C lobby with his attorney on March 11, 1998. Detective Coleman thought that Joseph had departed the State Police barracks long before Christopher

10

Cournoyer and his attorney arrived on March 11, 1998. Detective Coleman was surprised to learn that he had remained in the lobby for over a half hour until Christopher arrived that day. Detective Coleman also showed the same photo array containing Christopher Cournoyer's photograph to Ronald Vancelette. Ronald was unable to identify anyone as the driver of the vehicle in which he had been shot. *See* Affidavit of Det. Coleman, ¶ 23.

26. On Tuesday, March 17, 1998, Detective Coleman interviewed Christopher Cournoyer's wife, Rachael. Rachael told Detective Coleman that she was currently going through a divorce with Christopher. Rachael told Detective Coleman that on Monday or Tuesday of the first week of March, 1998, she received a telephone call at home from her husband. During the call, Christopher asked her if she had heard anything. Rachael asked what was going on, and Christopher replied that "something bad" had happened. Rachael told Detective Coleman that she asked Christopher if he or Scott had beaten somebody up, and Christopher replied, "No, but its more than that." Rachael asked if they were still alive, and Christopher replied that he did not know. Rachael told Detective Coleman that she then asked Christopher where he was and he replied, "I can't tell you. Away." Rachael then asked where Scott was, and Christopher replied, "Scott is away too." Rachael asked him where, and Christopher replied, "I can't tell you." Rachael asked him if he was far away, and Christopher replied, "Yes." She then asked him what he was driving, and Christopher replied, "A rental." Rachael asked Christopher if he was calling from a car phone, and Christopher replied, "No, they can be traced, I am calling from a pay phone." Rachael asked him if he was using the calling card, and Christopher replied, "No, I am using prepaid phone cards." At the end of the conversation, Rachael told Detective Coleman that Christopher said, "If anyone asks if you

11

talked to me, say no." Rachael told Detective Coleman that Christopher called her every day after that, but would not tell her where he was, only that Scott and he were together. On Friday, March 6, 1998, Christopher called Rachael crying and asked her if she knew what had happened. Rachael said that her boss had told her and that she knew why Scott had been arrested. Christopher told her that Scott didn't do it, and that he had told Scott to turn himself in. During this conversation, Christopher also told Rachael that he and Scott were going to go to Italy, but didn't think they could get fake passports. Rachael asked Christopher if he was the other person in the car, and Christopher replied, "No, I was at the casino." Rachael asked Christopher if Scott had been in the car, and he replied that Scott was out of town doing his thing. Rachael asked Christopher where he had been earlier in the week when he wouldn't tell her where he was. Christopher told Rachael that he and Scott had been staying at the Crown Plaza Hotel in Worcester, Massachusetts. Christopher told Rachael that none of this would have happened if she hadn't left him because he would have been home with her. Finally, Rachael told Detective Coleman that Christopher and Scott owned a gym together at 962 Riverside Drive in Thompson, Connecticut. She told Detective Coleman that the gym had been broken into in February, and that a few days later Scott's house in Thompson had also been broken into. Rachael told Detective Coleman that a safe had been taken from Scott's house. She said that, before the March 1, 1998, shooting of Ronald Vancelette, Christopher had told her who it was that he suspected of having broken into the gym and Scott's house, and that something was going to be done to them. *See* Affidavit of Det. Coleman, ¶ 24.

27. On March 18, 1998, Detective Coleman received copies of food receipts on Christopher Cournoyer's account at the Mohegan Sun Casino for meals eaten on March 1, 1998,

12

and March 12, 1998. The March 1, 1998, receipt indicated that Christopher spent $6.89 for food at 6:09 p.m. on that date. This corroborated what Christopher had earlier told Detective Coleman in the presence of his attorney. Detective Coleman is not a handwriting expert, but the signatures on both receipts from March 1, 1998, and March 12, 1998, appeared to be the same, indicating that Christopher was, in fact, at the casino on March 1, 1998, until about 6:09 p.m. *See* Affidavit of Det. Coleman, ¶ 25.

28. On March 18, 1998, Detective Shaw and Detective Coleman applied for and received search warrants for the premises at 240 County Home Road in Thompson (Scott Cournoyer's home), 962 Riverside Drive, Thompson (Scott and Christopher's storefront gym), 220 South Main Street, Putnam (the parents' residence where Christopher maintained a locked room), 109 County Road, Eastford (where Christopher resided with his wife Rachael), and Charter Communications in Windham (the cable television company servicing Christopher Cournoyer's home on March 1, 1998). Detective Shaw acted as Detective Coleman's co-affiant on each of the search warrants, although the investigation was assigned only to Detective Coleman. Nothing of particular evidentiary value in this case was found at Scott Cournoyer's home, at the gym, or in Christopher's locked room at the home of his parents. However, at Christopher's home in Eastford, Detective Shaw and Detective Coleman located several different types of ammunition and a shoulder holster, but no gun. The shoulder holster and the ammunition were seized as evidence. *See* Affidavit of Det. Coleman, ¶ 26.

29. On March 21, 1998, Detective Coleman interviewed Ronald Vancelette once more and obtained a third statement from him. This time Detective Coleman learned that Joseph Vancelette picked up his brother Ronald at about 10:00 a.m. that morning to play football.

13

Ronald stated that the pair, along with their friend Alan Stately, went to a school in Putnam around 3:30 p.m. to play basketball. Detective Coleman learned that the three men played basketball until around 5:30 or 6:00 p.m. Detective Coleman learned that, after leaving the school, Ronald had gone to Scott Cournoyer's house on March 1, 1998, to collect between $800 and $1,000 for a four-wheel motorbike sold to him by Alan Stately. Detective Coleman learned that Alan Stately was present in Joseph Vancelette's car at the time Ronald was dropped off at Scott Cournoyer's house. Ronald told Detective Coleman that it was just getting dark when he first arrived at Scott Cournoyer's house. He told Detective Coleman that it got dark while he was waiting for his brother to return, and that, although it felt like forever, it was probably only about thirty or forty minutes until the red Pontiac Grand Prix first appeared. *See* Affidavit of Det. Coleman, ¶ 27.

30. On Wednesday, March 24, 1998, Detective Coleman interviewed Christopher Cournoyer's landlord, Thomas Lynch. Mr. Lynch told Detective Coleman that he rents a house at 109 County Road in Eastford, Connecticut, to Christopher and his wife Rachael. Mr. Lynch told Detective Coleman that when Christopher Cournoyer moved into the house on February 21, 1998, there were blinds up on all of the windows except two. Mr. Lynch told Detective Coleman that he went to Wal-Mart in Windham, Connecticut, and purchased blinds for the two windows from which they were missing. Mr. Lynch stated that he gave the blinds to Christopher, and that he was "pretty positive" that the blinds were put up before March 1, 1998. *See* Affidavit of Det. Coleman, ¶ 28.

31. On March 24, 1998, Detective Coleman served the search warrant he had obtained earlier on Charter Communications in Windham, Connecticut, seeking the cable records on

Christopher Cournoyer's residence for the months of February and March, 1998. Detective Coleman wanted to verify the accuracy of Christopher Cournoyer's story about his activities and location on the evening of March 1, 1998. According to the seized records, the movie that Christopher claimed to have watched on HBO was showing only on pay-per-view on March 1, 1998. The records indicated that Christopher had not ordered pay-per-view on March 1, 1998. Richard Elwell, the Charter Communications manager, told Detective Coleman that the only way Christopher could have seen that movie was to order pay-per-view – and the records indicated that he did not do so. *See* Affidavit of Det. Coleman, ¶ 29.

32. Based on the information Detective Coleman had collected to date, he drafted an arrest warrant application for Christopher Cournoyer on Friday, April 3, 1998. The warrant was signed by a judge of the Connecticut Superior Court on Monday, April 6, 1998, and charged Christopher with the offenses of Conspiracy to Commit Murder, in violation of Connecticut General Statutes §§ 53a-48 and 53a-54, with Conspiracy to Commit Assault in the First Degree, in violation of Connecticut General Statutes §§ 53a-48 and 53a-59, and with Kidnapping in the First Degree With A Firearm, in violation of Connecticut General Statutes § 53a-92a. *See* Affidavit of Det. Coleman, ¶ 30.

33. Christopher Cournoyer was arrested at his gym located at 962 Riverside Drive, Thompson, Connecticut, by Connecticut State Police Trooper Aiello on Tuesday, April 7, 1998. *See* Affidavit of Det. Coleman, ¶ 31.

34. At the time Detective Coleman completed the arrest and search warrant affidavits, he believed that he had included sufficient information upon which to establish probable cause for the relief requested, that he had not knowingly included any false statements in support of the

applications, and that he had not omitted, intentionally or otherwise, any material, exculpatory information which might mislead the judge to whom the affidavits were presented. *See* Affidavit of Det. Coleman, ¶ 32.

35. In the various affidavits associated with this investigation, Detective Coleman did not mention the fact that Ronald Vancelette had been unable to identify Christopher Cournoyer when he was shown a photographic array containing Christopher's picture on March 14, 1998. Detective Coleman did not consider this fact exculpatory in nature because Ronald Vancelette had previously told him on March 2, 1998, that he did not get a good look at the driver of the red Pontiac Grand Prix in which he was shot. *See* Affidavit of Det. Coleman, ¶ 33.

36. Detective Coleman also did not include in any of the affidavits the fact that the photograph of Christopher Cournoyer identified by Joseph Vancelette on March 14, 1998, as that of the driver of the car that chased him on March 1, 1998, was the same photograph which Detective Coleman had taken on March 11, 1998, when Joseph had seen Christopher at the State Police barracks in Tolland. Detective Coleman did state in the affidavits, however, that Joseph Vancelette told him, at the time he identified Christopher Cournoyer, that he had seen Christopher entering the barracks on March 11, 1998, several days prior to viewing the photographic lineup containing Christopher's picture. Based on his training and experience, Detective Coleman did not believe that the fact that he showed Joseph Vancelette the same photo he took on the day that Joseph saw Christopher at the barracks was material to this investigation, or exculpatory in any way. The photo array in question was constructed with eight photos of white males of similar height, weight, build and features as Christopher Cournoyer, and was non-

suggestive in nature. The photo Detective Coleman took on March 11, 1998, was the only photo of Christopher Cournoyer he had available to him. *See* Affidavit of Det. Coleman, ¶ 34.

37. Detective Coleman never took a written statement from Christopher Cournoyer regarding this investigation, and does not recall him ever telling him whether he, at any time, had worn long hair or a goatee. Christopher did not have either long hair or a goatee when Detective Coleman spoke with him on Wednesday, March 11, 1998, but Detective Coleman knew that these features could be easily changed at any time simply by getting a haircut or shaving. Aside from this, the only indication that the driver of the red Pontiac Grand Prix had a goatee was a statement from Joseph Vancelette that the driver of the vehicle "maybe" had a goatee. Detective Coleman note that this observation was made at night while being chased by the red Pontiac traveling northbound on Interstate 395 at speeds in excess of 90 mph. Given the highly uncertain nature of the observation, Detective Coleman did not consider this information to be reliable one way or the other, and did not include it in the warrant affidavits. In his statement given to Detective Coleman on March 2, 1998, Joseph stated that he could not see whether the driver had long hair. Therefore, Detective Coleman had no reason to include information concerning the length of Christopher's hair in the warrant affidavits. *See* Affidavit of Det. Coleman, ¶ 35.

38. At the time Detective Coleman completed the arrest and search warrant affidavits, he did not know how much distance lay between Oxford, Massachusetts and Uncasville, Connecticut, where the Mohegan Sun Casino is located. Detective Coleman did know, however, that Christopher could be placed at the casino as late as 6:09 p.m. on the night of the shooting, that the shooting was first reported to the State Police at 7:40 p.m., and that Scott Cournoyer tried to conceal his whereabouts on March 1, 1998, between the hours of 6:00 p.m. and 8:00 p.m.

Given the uncertain nature of the time estimates provided by the suspects, victim and witnesses, Detective Coleman believed that Christopher had ample time in which to be present during the shooting of Ronald Vancelette. Detective Coleman did not consider Christopher's professed alibi to have eliminated the possibility of his being the driver of the red Pontiac Grand Prix at the time Ronald Vancelette was shot. Detective Coleman did not consider the information offered by Christopher to have been exculpatory in nature such that it should have been included in the affidavit. Detective Coleman did not believe that the omission of this information would have materially misled the judge who signed the warrants. To the contrary, it was Detective Coleman's belief that even if this information had been included, the judge would still have concluded that probable cause existed to support the arrest of Christopher Cournoyer. *See* Affidavit of Det. Coleman, ¶ 36.

39. Prior to the date upon which the arrest and search warrant affidavits were completed, Joseph Vancelette never said that it was approximately 5:45 p.m. when he was chased on the highway by a man he later identified as the plaintiff – a point in time in which Detective Coleman knew Christopher Cournoyer was still at the Mohegan Sun Casino – and that it was after 5:45 when he returned to the area to retrieve his brother. Detective Coleman's report indicates, among other things, that Joseph and Ronald Vancelette played basketball at a school in Putnam until as late as 6:00 p.m. before going to Scott Cournoyer's home. While the report contains several conflicting accounts of time and events, Detective Coleman had no way of knowing which, if any, of these was the most accurate. Assuming the relative accuracy of Joseph's statement that Ronald asked Joseph to drive him over to Scott Cournoyer's house at around 5:30 p.m. on March 1, 1998, Detective Coleman concluded that this information did not

18

establish exactly when Joseph actually did so, or from what location he began the trip. Detective Coleman concluded, however, that after Joseph dropped off his brother, he went to a local Wendy's (or Burger King) Restaurant on Route 44 to get something to eat before returning to pick up his brother. Detective Coleman did not know how long Joseph stayed at the restaurant. Given the dearth of accurate, verifiable details regarding the time frame involved, Detective Coleman did not consider Christopher's proffered alibi as exculpatory. In his estimation, there was no reason to believe that because Christopher was last placed at the casino at 6:09 p.m., he could not also have been the driver of the vehicle in which Ronald Vancelette was shot approximately one hour and thirty-one minutes later. *See* Affidavit of Det. Coleman, ¶ 37.

40. While Detective Coleman concluded that sunset on March 1, 1998, could indeed be verified as at 5:38 p.m., he did not know this information at the time he completed the arrest and search warrant applications for Christopher Cournoyer. He did know, however, that it does not actually get dark for some time after the sun officially sets. Ronald Vancelette stated that it was just getting dark when he first arrived at Scott Cournoyer's house, that it got dark while he was waiting, and that he could have waited for his brother to return for as much as a couple of hours before he was picked up by the red Pontiac Grand Prix. Detective Coleman concluded that, if anything, this piece of information, coupled with Ronald's statement that it was just getting dark when he first arrived at Scott Cournoyer's house, made it more likely that Christopher was the driver of the red Pontiac. *See* Affidavit of Det. Coleman, ¶ 38.

41. The only indication Detective Coleman had in his report that Ronald may have been hitchhiking at the time he was picked up by the red Pontiac grand Prix is the March 2, 1998, statement of Ronald's girlfriend, Dawn Blanchette. She told Detective Coleman that a doctor

19

from Windham Hospital called her and told her that Ronald had been shot while hitchhiking. Ronald Vancelette never stated in any of his statements that he was hitchhiking. Consequently, Detective Coleman believed that there was no reason for him to include this likely piece of misinformation in the arrest or search warrant affidavits. *See* Affidavit of Det. Coleman, ¶ 39.

DEFENDANTS
Neverill Coleman and Harold Shaw

RICHARD BLUMENTHAL
ATTORNEY GENERAL

By: _____
Stephen R. Sarnoski
Assistant Attorney General
MacKenzie Hall
110 Sherman Street
Hartford, Connecticut 06105
Tel. (860) 808-5450
Federal bar #c05129
E-mail: stephen.sarnoski@po.state.ct.us

## CERTIFICATION

I hereby certify that a copy of the foregoing motion was mailed this __14th__ day of __January__, __2004__, to the following pro se parties and/or counsel of record:

T.J. Morelli-Wolfe, Esq.
Jon Schoenhorn & Associates
97 Oak Street
Hartford, Connecticut 06106

_____
Stephen R. Sarnoski
Assistant Attorney General
