**UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT**

```
------------------------------x
CHRISTOPHER COURNOYER,          :
                                :
     Plaintiff,                 :
                                :
v.                              :    Civil No. 3:01CV00221(AWT)
                                :
NEVERILL COLEMAN and            :
HAROLD SHAW,                    :
                                :
     Defendants.                :
------------------------------x
```

## RULING ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

The plaintiff, Christopher Cournoyer ("Christopher"), filed this civil rights action pursuant to 42 U.S.C. § 1983 against Connecticut State Police Detective Neverill Coleman ("Coleman") and Detective Harold Shaw ("Shaw") in a two-count complaint. In the First Count, the plaintiff alleges that the defendants maliciously prosecuted him by searching his residences and business and arresting him without probable cause because they obtained warrants by submitting affidavits that contained false statements and/or omitted material statements of fact in violation of the Fourth and Fourteenth Amendments of the United States Constitution. In the Second Count, the plaintiff sets forth claims for false arrest, false imprisonment, malicious prosecution and intentional infliction of emotional distress in violation of Article I, sections 7 and 9 of the Connecticut

Constitution and Connecticut common law.

The parties filed cross-motions for summary judgment. For the reasons set forth below, the defendants' motion for summary judgment is being granted, and the plaintiff's motion for summary judgment is being denied.

## I.    **FACTUAL BACKGROUND**

For purposes of deciding each motion, the court views all facts in the light most favorable to, and all reasonable inferences have been drawn in favor of, the non-movant. This ruling sets forth facts as to which there is a genuine dispute, and draws reasonable inferences from the facts, in the light most favorable to the plaintiff because the court is granting the defendants' motion.

On Sunday, March 1, 1998, at about 8:00 p.m., Coleman was assigned to investigate a shooting which occurred in a vehicle traveling along Horse Hill Road near the intersection with North Road in Ashford, Connecticut. The incident was reported to Connecticut State Police, Troop C at 7:40 p.m. by Wayne Fletcher, who happened to be driving with companions down Horse Hill Road that evening when he observed the victim, Ronald Vancelette ("Ronald"). Ronald was screaming that he had been shot. First aid was rendered, and an ambulance was called. Ronald was brought to Windham Community Memorial Hospital where he was treated for his injuries.

Coleman responded to the hospital where he first spoke with the victim.  Ronald initially told Coleman he had been jogging in Webster, Massachusetts, when a car approached him and he was asked for directions.  Ronald stated that a guy in the back seat pulled him into the car and began pistol whipping him while the driver said, "Do him, do him!"  Ronald said he was shot in the hip when he jumped out of the car.  Coleman told Ronald that he did not believe his story because he did not look like a person who went jogging, and the sneakers he was wearing were not jogging shoes.  This interview ended abruptly when Ronald was taken away to have a CT Scan performed.  After Ronald left, Coleman spoke with Ronald's brother, Joseph Vancelette ("Joseph").  Joseph told Coleman that he had dropped his brother off at a house on Route 21 in Thompson, Connecticut, so he could collect some money owed to him by some guy.  Joseph remembered a black Chevrolet Camaro being parked in the driveway.  Joseph told Coleman that he believed that the person who shot Ronald was the same person who had chased Joseph that evening driving a newer model, red Pontiac Grand Prix while waving a gun at him.  Coleman told Joseph that Ronald had not been truthful in reporting to Coleman what had happened, and he asked Joseph to speak with Ronald and ask him to tell exactly what happened.  Joseph said he would, and told Coleman that Ronald was afraid for himself and his family.

On Monday, March 2, 1998, Coleman obtained a written statement from Ronald.  Ronald stated that, on the previous evening, at about 4:00 p.m., Joseph picked him up at his apartment in Webster, Massachusetts.  Ronald told Coleman that he was dropped off by his brother on Route 21 in Thompson, Connecticut at a home occupied by an individual known as "Scott Conners."  Ronald stated that he was not sure what time he was dropped off by his brother, but that it was a twenty minute drive between the two locations.  According to Ronald, he had gone to "Scott Conners'" home to collect some money, which was owed to him.  Ronald stated that he had never met "Scott Conners," but knew of him through a friend.  Ronald told Coleman that "Scott Conners" was not at home, so he waited outside along Route 21 for a couple of hours for his brother to return to pick him up.

Ronald told Coleman that while he was waiting, a red, four door, Pontiac Grand Prix pulled up next to him and the passenger asked him if he wanted a ride.  Ronald said "yes" and got into the back seat behind the driver.  Ronald told Coleman that he did not recognize the front seat passenger, and that he did not get a good look at the driver.  Ronald told the driver he was going to Webster, Massachusetts.  After hearing this, the driver turned the car around and began to head in the opposite direction.  When Ronald questioned him about this, he was told that they were going to the highway.

4

Ronald told Coleman that the front seat passenger then climbed over the seat into the back and began to hit him on the head with a gun asking, "Who broke into my gym?"  Ronald told Coleman that once the passenger asked this question, he knew it was "Scott Conners" because "Scott Conners'" gym had been broken into.  Ronald told Coleman that while this was going on, the driver was saying, "Do him, do him!" which Ronald understood to mean kill him.

Ronald told Coleman that he then opened the left rear door of the car and jumped out while it was moving.  Ronald told Coleman that, as he did so, "Scott Conners" shot him in the stomach.  Ronald gave Coleman a signed, written statement including this information.  In a statement given on March 21, 1998, Ronald indicated that he "didn't hear the [gunshot], but all of a sudden [he] got really weak and Scott let [him] go and [he] fell out of the car."

Later on March 2, 1998, Coleman obtained a second statement from Ronald.  This statement reflected the fact that Ronald had identified photograph #1, which was a photograph of the plaintiff's brother, then known to Ronald as "Scott Conners," from an array of eight photographs as being that of the man who shot him the previous day.  In this statement, Ronald asserted that the person in the photograph was the person he "think[s] is Scott Conners."

On Monday, March 2, 1998, Trooper Stevens of the Connecticut State Police obtained a signed statement from Joseph. Joseph stated that at about 5:30 p.m. on Sunday, March 1, 1998, Ronald asked him to drive him over to someone's house in Thompson, Connecticut so he could collect some money. Joseph did not tell Trooper Stevens where he and Ronald were when this request was made. He did say that on the way to "Scott Conners'," they drove south on Interstate 395 and got off at Exit 99. Joseph stated that he dropped his brother off at a house behind a gun shop on Route 21 in Thompson, Connecticut. Joseph stated that, while leaving this area, he saw a red Grand Prix Wide Track, late 90's model, drive past him in the direction of "Scott Conners'" house. Joseph stated that he continued on and stopped at a Wendy's restaurant to get something to eat at the drive-thru window. Joseph did not state how long he remained at the Wendy's restaurant. Joseph stated that he then went back to where he dropped off Ronald and saw the same red Grand Prix parked in the driveway of the home with its lights off.

Joseph stated that as he drove past the driveway, the headlights of the red Grand Prix came on. He stated that the car then began to follow him on the local roads toward the highway. Joseph stated that he then got onto Interstate 395 northbound, followed by the Grand Prix which then tried to run him off the road. Joseph stated that he got off the highway at Exit 99, and

6

got right back on, but the Grand Prix continued to follow him.

Joseph stated that he accelerated to between 90 and 100 miles per hour and the Grand Prix pulled next to him on the highway. Joseph stated that he could see the driver. Joseph described the driver as a white male with dark hair, maybe with a goatee and moustache, and in his early to mid-thirties. He told Trooper Stevens that he did not know how long the driver's hair was. He said the driver yelled, "Pull over!" while waving a gun up high with his left hand. Joseph described the gun as a stainless steel, .380 semi-automatic, about three inches long. Joseph stated that he was afraid for his life. He said he got off the highway at Exit 44 in Massachusetts and pulled behind an Oxford, Massachusetts police cruiser. Joseph stated that the Grand Prix stopped following him at that point. Joseph told Trooper Stevens he went back in a different car to the area where he dropped off Ronald, but could not find him. Joseph told Trooper Stevens that he then went home. He received a telephone call from Ronald's girlfriend at about 11:00 p.m. that night telling him that his brother had been shot.

On March 14, 1998, Coleman took a second statement from Joseph. This time Joseph told Coleman that he picked up his brother Ronald, along with Alan Stately, at about 11:30 a.m. on Sunday morning, March 1, 1998. He said that the three men drove around looking for a pickup football game. Joseph told Coleman

that the three men went to the Putnam Intermediate School at
about 3:30 p.m. to play basketball, and stayed there until about
5:30 p.m.  Joseph said he then dropped Ronald off at a house on
Route 21 in Thompson, Connecticut and left.  He stated that he
arrived at a Burger King Restaurant at about 5:45 p.m. and bought
some hamburgers to eat.  Joseph did not tell Coleman how long he
remained at Burger King.  Joseph stated that he then drove back
to where he had dropped Ronald off and found him standing at the
end of the driveway.  Joseph stated that Ronald told him the guy
had not shown up yet and to come back later.  As Joseph was
leaving, he saw a red car pull into the driveway where Ronald had
been standing.  Joseph stated that he then turned around and went
back, but he could not find his brother.  Joseph stated that,
after that, everything happened just as he had said in his first
statement.

     Detective Abrams dispatched a trooper to the house on Route
21 in Thompson, Connecticut at which Joseph said Ronald was
dropped off for the purpose of verifying who lived there.  The
trooper obtained a registration plate from a vehicle parked at
the house at 240 County Home Road, and it was determined that the
vehicle was registered to Scott Cournoyer.  A criminal records
check on Scott Cournoyer revealed a lengthy criminal record in
Massachusetts, including narcotics and firearms related offenses.

     On Monday, March 2, 1998, Sergeant Shemansky, Detective

8

Abrams, Trooper Aiello and Coleman spoke with Donald Brown of the Koinania School of Sports, located at 240 County Home Road in Thompson, Connecticut.  Brown informed the detectives that Scott Cournoyer rented a house from him at 240 County Home Road, and that he recently saw "Roger Cournoyer" driving his brother Scott Cournoyer around in a red Pontiac Grand Prix.

On Monday, March 2, 1998, Sergeant Shemansky, Detective Abrams, Trooper Aiello and Coleman also spoke with Benjamin Kondysar, the caretaker of the grounds at the Koinania School of Sports.  Kondysar told the detectives that he had recorded the registration plate on the red Pontiac Grand Prix he had seen Scott Cournoyer driving.  Kondysar gave the plate as Massachusetts registration 648-8BV.  Further investigation revealed that this plate was registered to Enterprise Rental Cars of Massachusetts on a red Pontiac Grand Prix.

On that same afternoon, Sergeant Shemansky, Detective Abrams, Trooper Aiello and Coleman spoke with James Northridge. Northridge owned a hardware store located at 963 Riverside Drive in Thompson, Connecticut.  He told the detectives that Scott Cournoyer was renting a store right next to his, and that Scott was trying to open up a weight lifting gym.  Northridge stated that the last time he saw Scott, he was driving a red Grand Am with Massachusetts registration plates on it.

On Tuesday, March 3, 1998, Coleman spoke with Jennifer Pineo

9

of Enterprise Rental Cars in Auburn, Massachusetts.  Pineo told
Coleman that her records indicated that Scott Cournoyer had
rented a red Pontiac Grand Prix on February 13, 1998, and that
the car was dropped off at the Auburn, Massachusetts office while
it was closed overnight sometime between 7:00 p.m. on March 1,
1998 and 7:00 a.m. on March 2, 1998.  Pineo informed Coleman that
Christopher Cournoyer was listed as the second driver on the
rental contract, and that Christopher came into the office at
about 10:00 a.m. on March 2, 1998 and paid the outstanding
balance of the rental fee in cash.

     Coleman obtained an arrest warrant for Scott Cournoyer.
Shaw and Coleman attempted to locate both Scott and Christopher
without any success throughout the first week of March, 1998.
Scott turned himself in at the Connecticut State Police barracks
in Danielson on Thursday evening, March 5, 1998.  At the time he
was arrested, Scott invoked his right to remain silent upon the
advice of his attorney.  Consequently, Coleman was prevented from
interviewing Scott, including asking him whether Christopher had
played any role in the shooting.  However, before Scott invoked
his right to remain silent, he spoke with Detective Sarant of the
Connecticut State Police.  Sarant told Coleman that Scott told
Sarant that he was at dinner with friends, Sue Reipold and Bill
Robinson, at their home in Millers Falls, Massachusetts at 6:00
p.m. on March 1, 1998, and that they had post roast for dinner.

On Friday, March 6, 1998, Shaw and Coleman met with Reipold and Robinson at their home in Millers Falls, Massachusetts. Robinson told the detectives that he had received a telephone call from Scott Cournoyer sometime after 8:00 p.m. on Sunday, March 1, 1998. Robinson told the detectives that Scott had said, "If anyone calls, say I was there between 6:00 p.m. and 8:00 p.m. on Sunday night." Scott asked what Robinson had for dinner. Robinson told him "pot roast." When Robinson asked Scott why, Scott said, "Don't worry about it." Robinson told the detectives that Scott Cournoyer was not present for dinner in his home on March 1, 1998.

On Wednesday, March 11, 1998, at about 12:20 p.m., Joseph came to Connecticut State Police Troop C at Coleman's request. Coleman showed Joseph a photographic line-up and asked Joseph if he could identify the driver of the red Pontiac Grand Prix he had described in his statement. Joseph was unable to identify any of the persons shown in the photographs as the driver of that vehicle. Coleman tried to construct a composite photograph of the driver with Joseph, but was unable to do so. Coleman then escorted Joseph to the lobby at about 1:30 p.m. and said goodbye to him.

On Wednesday, March 11, 1998, at about 2:00 p.m., Scott Cournoyer's brother, Christopher Cournoyer, came to Connecticut State Police Troop C at Coleman's request. He was accompanied by

11

his lawyer, Attorney Arthur Meisler.  Coleman had previously spoken with Attorney Meisler on Friday, March 6, 1998 by telephone.  Attorney Meisler had informed Coleman by telephone on Friday, March 6, 1998 that his client was at the Mohegan Sun Casino on the afternoon of March 1, 1998, and that he was attempting to obtain paperwork from the casino which would prove this claim.  Following his arrival at Connecticut State Police Troop C on Wednesday, March 11, 1998, Christopher told Coleman that he was at the Mohegan Sun Casino on Sunday, March 1, 1998. Christopher gave Coleman a photocopy of a win/loss statement for account #012152278.  The statement indicated that Christopher started playing blackjack at 3:57 p.m. for a period of one hour and thirty-eight minutes, i.e. until 5:35 p.m.  Christopher also told Coleman that he spent six dollars and fifty cents at one of the casino restaurants before leaving that afternoon.

Christopher told Coleman that he lived at 109 County Road in Eastford, Connecticut.  He told Coleman that on his way home from the casino, he stopped at a Dunkin' Donuts shop in Putnam, Connecticut and arrived home at about 7:30 p.m.  Christopher told Coleman that he stayed home the remainder of the evening, put up some window blinds, and then turned on his television set and watched the movie "Contact," starring Jodie Foster, on HBO beginning at 8:00 p.m.  Christopher told Coleman that he subscribed to Charter Communications Cable, and that he did not

12

order any pay-per-view channels that day.  Christopher told Coleman that he did not drop off the red Pontiac at the rental company that night.  Coleman told Christopher that his brother Scott had told him that it was Christopher who dropped off the rental car that night, and that one of them was lying. Christopher replied, "A lie is not a lie until you swear to it." Christopher did not reduce his oral explanation of his activities to a sworn, written statement.

While he was at the State Police barracks on Wednesday, March 11, 1998, Christopher permitted Coleman to take a Polaroid photograph of him.  On the following day, March 12, 1998, Coleman used that photograph along with seven others to construct a photographic line-up.

On Saturday, March 14, 1998, both Joseph and Ronald came to Connecticut State Police Troop C at Coleman's request.  Ronald waited in the lobby while Coleman showed a photographic array to Joseph.  Upon viewing the array, Joseph picked out photograph #6 as depicting the driver of the red Pontiac Grand Prix.  This was Christopher Cournoyer's photo.  After identifying the photograph of Christopher Cournoyer, Joseph told Coleman that he had seen Christopher walk into the Connecticut State Police Troop C lobby with his attorney on March 11, 1998. Coleman thought that Joseph had departed the State Police barracks long before Christopher and his attorney arrived on March 11, 1998.  Coleman was

13

surprised to learn that Joseph had remained in the lobby for over a half hour and until Christopher arrived that day. Coleman also showed the same photographic array containing Christopher Cournoyer's photograph to Ronald. Ronald was unable to identify anyone as the driver of the vehicle in which he had been shot.

On Tuesday, March 17, 1998, Coleman interviewed Christopher Cournoyer's wife, Rachael. Rachael told Coleman that she was going through a divorce with Christopher. Rachael told Coleman that on Monday or Tuesday of the first week of March, 1998, she received a telephone call at home from her husband. During the call, Christopher asked her if she had heard anything. Rachael asked what was going on, and Christopher replied that "something bad" had happened. Rachael told Coleman that she asked Christopher if he or Scott had beaten somebody up, and Christopher replied, "No, but its more [than] that." Rachael asked if they were still alive, and Christopher replied that he did not know. Rachael told Coleman that she then asked Christopher where he was and he replied, "I can't tell you. Away." Rachael then asked where Scott was, and Christopher replied, "Scott is away too." Rachael asked him where, and Christopher replied, "I can't tell you." Rachael asked him if he was far away, and Christopher replied, "Yes." She then asked him what he was driving and Christopher replied, "A rental." Rachael asked Christopher if he was calling from a car phone, and

14

Christopher replied, "No, they can be traced, I am calling from a pay phone." Rachael asked him if he was using the calling card, and Christopher replied, "No, I am using prepaid phone cards." Rachael told Coleman that Christopher said at the end of the conversation, "If anyone asks if you talked to me, say no." Rachael told Coleman that Christopher called her every day after that, but would not tell her where he was, only that Scott and he were together. On Friday, March 6, 1998, Christopher called Rachael crying and asked her if she knew what had happened. Rachael said that her boss had told her and that she knew why Scott had been arrested. Christopher told her that Scott did not do it, and that he had told Scott to turn himself in. During this conversation, Christopher also told Rachael that he and Scott were going to go to Italy, but did not think they could get fake passports. Rachael asked Christopher if he was the other person in the car, and Christopher replied, "No, I was at the casino." Rachael asked Christopher if Scott had been in the car, and he replied that Scott was out of town doing his thing. Rachael asked Christopher where he had been earlier in the week when he refused to tell her where he was. Christopher told Rachael that he and Scott had been staying at the Crowne Plaza Hotel in Worcester, Massachusetts. Christopher told Rachael that none of this would have happened if she had not left him because he would have been home with her. Finally, Rachael told Coleman

that Christopher and Scott owned a gym together at 962 Riverside
Drive in Thompson, Connecticut.  She told Coleman that the gym
had been broken into in February, and that a few days later
Scott's house in Thompson had also been broken into.  Rachael
told Coleman that a safe had been taken from Scott's house.  She
said that, prior to March 1, 1998, Christopher had told her that
he suspected that Eric Smith, Scott Smith (Yentil), and a third
person had broken into the gym and Scott's house, and that
something was going to be done to them.

On March 18, 1998, Coleman received copies of food receipts
on Christopher Cournoyer's account at the Mohegan Sun Casino for
meals eaten on March 1, 1998 and March 12, 1998.  The March 1,
1998 receipt indicated that Christopher spent $6.89 for food at
6:09 p.m. on that date.  This corroborated what Christopher had
told Coleman earlier.  Coleman is not a handwriting expert, but
the signatures on the receipts from both March 1, 1998 and March
12, 1998 appeared to be the same, indicating that Christopher was
at the casino on March 1, 1998 until at least 6:09 p.m.

On March 18, 1998, Shaw and Coleman applied for and received
search warrants for 962 Riverside Drive, Thompson (Scott and
Christopher's storefront gym), 220 South Main Street, Putnam (the
Cournoyer parents' residence where Christopher maintained a
locked room), and 109 County Road, Eastford (where Christopher

16

resided with his wife Rachael).[1]  Shaw acted as Coleman's co-affiant on each of the search warrant applications, although the investigation was assigned only to Coleman.

The affidavit with respect to the plaintiff's home at 109 County Road, Eastford, Connecticut stated:[2]

> That the affiants, Det. Neverill Coleman and Det. Harold Shaw, are members of the Connecticut State Police, presently assigned to Eastern District Criminal Investigation Section, and have approximately twenty three years of combined police experience.  That the affiants have knowledge of the facts and circumstances here in after related as a result of their own investigative efforts as well as those of other officers who have related their findings to them.
>
> That on Sunday, March 1, 1998, at approximately 1940 hours, Troop 'C' received a call from Tolland Mutual Aid, reporting that Ronald J. Vancelette DOB 02-07-71, had been found along side the road at the intersection of North Rd. and Horse Hill Rd., in the town of Ashford, CT with a single gunshot wound to his right upper hip.  That Ronald J. Vancelette was transported to Windham Community Memorial Hospital, for treatment of his injuries sustained from the gunshot.  That Vancelette received serious physical injuries as a result of being shot and the projectile was lodged near his spine in his back, which required surgery to remove.
>
> That on Monday, March 2, 1998, between 0030 and 0118 hours, the Affiant obtained a signed statement from Ronald J. Vancelette at Windham Hospital, in the Geer Wing of the 2nd floor, in room 2710.  That Ronald stated

---

[1] Search warrants were also applied for and obtained for the premises at 240 County Home Road in Thompson (Scott Cournoyer's home) and Charter Communications Cable in Windham (the cable television company that provided service to Christopher's home on March 1, 1998).

[2] Bold type indicates a section that does not appear, in substance, in the affidavit in support of the application for the arrest warrant for Christopher Cournoyer.

that on 03-01-98 around 1600 hours, his brother Joseph
Vancelette DOB 03-14-70, picked him up at his home on
Main St., in the town Webster, MA.   That Joseph then
drove him to Scott Connors' house on Rt. 21, in the town
of Thompson, CT.   That he never met Connors and knew
where Connors lived, through a mutual friend.   That the
reason for going to Connors' was to collect money that
was owed to him by Connors.   That Connors was not at home
and he waited on Rt. 21 for his brother Joseph to pick
him up.   That Ronald waited for about two (2) hours, but
his brother never showed up.   That Ronald goes on to
state that a red four (4) door Gran Prix or Gran Am
pulled up next to him and asked him if he wanted a ride,
which he stated "yes."   That he did not recognized the
two (2) white males in the car when he got into car by
the left rear door and sat behind the driver.   That once
he was in the car, he told the driver that he was going
to Webster, MA at which time, the driver of the car
turned the vehicle around heading in the opposite
direction from Webster, MA.   That when Ronald questioned
the driver about his direction, the driver said he was
going to the highway.   That the right front passenger in
the car then climbed over the front seat into the rear
passenger compartment with a gun in his hand.   That once
the passenger was in the back seat, he started hitting
Ronald in the head with the gun, while asking him "who
broke into my gym" over and over.    That once the
passenger asked him that, Ronald knew that the passenger
was Scott Connors, because he knew Connors' gym had been
broken into and he thinks he knows who broke into the
gym.   That Connors then put the muzzle of the gun up to
his head and to his face several times throughout the
ordeal, while Connors told him that he was going to kill
him.   That the driver of the car kept on saying "do him,"
which Ronald thought meant kill him.   That he realized
during the trip, that he was no longer on the main roads;
but, on back roads.   That Ronald further stated that he
opened the left rear passenger door and tried to jump out
of the car while it was moving, because, he thought they
were going to kill him.   That while he was trying to jump
out of the car, Connors grabbed the hood of his sweat
shirt and was trying to pull him back into the car.
Ronald states that he had his hands on the top of the car
trying to jump out while the car was going about forty
miles per hour, when Connors shot him in the stomach.
That he fell onto the surface of the road and rolled into
the grass.   That he tried to get up and realized that he
could not move his right leg and about that time, a women

18

came over and helped him.

That on Monday, March 2, 1998, at approximately 0034 hours, Tpr. Stevens # 363 obtained a signed statement from Joseph Vancelette DOB 03-14-70, at Windham Hospital. Joseph Vancelette states that on Sunday, March 1, 1998, at about 1730 hours or so, his brother Ronald Vancelette asked him to drive him over to this guy's (Scott Cournoyer) house in Thompson, CT, to collect some money. That he drove Ronald to a house located behind a gun shop on Rt. 21, in Thompson.  That he dropped Ronald off at this house and got back on Rt. 21 when he notice a red Grand Prix Wide Track, late nineties model, drive past him.   That he continued on and went to a Wendy's restaurant on Rt. 44 and got something to eat at the drive-thru window.  That he drove back to get Ronald and as he was coming up on the driveway where he dropped Ronald off, he saw the same Grand Prix that had passed him earlier parked in the driveway with it lights off. That as he drove past the driveway he saw the headlights of the Grand Prix go on.  That he continued driving on Rt. 21 and turned around at Rt. 193, as did the Grand Prix.  That Joseph further stated that at that time he felt that he was being followed.  That he got onto Rt. 44 and made a right hand turn at a set of lights and the next thing he knew, the Grand Prix flew out from Rt. 21 onto Rt. 44 sideways and was now next to his car.  That he sped off and was traveling about 60 mph or so and the Grand Prix was right on his bumper.  That he got onto I-395 traveling north and the Grand Prix was still following him and tried to run him off the road.  That the Grand Prix was swerving towards him, trying to get behind him and then in front of him.  That he got off I-395 at exit 99 and then drove back up onto the highway. That the Grand Prix was still behind him and now they were both doing about 90 to 100 mph.  That the Grand Prix came along side of his car on the passenger side and he could see the window down on the Grand Prix and a white male driver with dark hair, maybe with a goatee and mustache, in his early to mid thirties.  That the driver started yelling "Pull it over!" while waving a gun up high with his left hand.  That the gun looked like a stainless steel color, 380 semi-automatic and was only about three inches long.  That he was scared for his life and got off the highway at exit 4 and pulled behind an Oxford, MA police officer.  That the Grand Prix stopped following him at that point.

19

That Det. Abrams #1092 had a trooper drive over to the house where Ronald described where Connors lives in Thompson, CT and the trooper obtained a registration plate from a vehicle that was parked at 240 Country Home Rd.. That the CT marker plate 516CWT was run through NCIC and it was determined that the vehicle was registered to Scott Cournoyer DOB 06-04-70. That Scott Cournoyer is the person that Ronald refers to as Connors. That a criminal history check revealed that Scott Cournoyer has a lengthy criminal record in MA, to include narcotic and firearm violations.

That Donald Brown is the owner of Koinania School of Sports, located on 240 Country Home Rd., in the town of Thompson, CT and rents apartments on his property. That Brown stated that he rents to Scott Cournoyer and that he has seen Scott Cournoyer recently driving with his brother Chris Cournoyer in a red Pontiac Grand Prix.

That Benjamin Kondysar is a Caretaker on the grounds of Koinania School of Sports and he recorded the registration of the red Pontiac Grand Am he has seen Scott Cournoyer driving as MA registration number 648-8BV. That further investigation revealed that Scott Cournoyer rented the red Pontiac Grand Am from Enterprise Rental Car in the State of MA.

That the Affiant contacted Larry Merrill of the Loss Control section of Enterprise Rental Car in Woburn, MA., who stated that Scott Cournoyer rented the red Gran Am from his company on 02-13-98, and that the car was returned to Auburn, MA on 03-02-98. That Merrill put the Affiant in contact with Jennifer Pineo of the Auburn, MA Enterprise Rental Car Office. That Pineo stated that the Grand Am had been dropped off at her office sometime before the office opened up, between 03-01-98, at 1900 hours and 03-02-98, at 0700 hours. That on 03-02-98, around 1000 hours, Christopher Cournoyer, brother of Scott Cournoyer came into the office and paid the remaining balance of eight hundred and ninety five dollars ($895.00) in cash. That Scott Cournoyer was the person who rented the car and that Christopher Cournoyer was listed as the second driver.

That on 03-02-98, the Affiant went back to Windham Hospital and showed Ronald Vancelette a photo lineup of eight (8) similar looking white males to include Scott Cournoyer. That Ronald selected photo #1 of Scott

20

Cournoyer as the person who climbed over the back seat of the car and hit him several times with a gun, threaten to kill him, and shot him as he attempted to jump out of the car.

**That on Thursday, March 5, 1998, Scott Cournoyer was arrested on a G.A. 11 issued arrest warrant for criminal attempt to commit murder, at Troop 'D' after he turned himself in. That after Scott Cournoyer waived his rights to remain silent, he stated that he had moved in with his brother Christopher Cournoyer on County Rd., in Eastford, CT.**

That on Wednesday, March 11, 1998, at approximately 1400 hours, Christopher Cournoyer came into Troop 'C' with his attorney Arthur P. Meisler, for the purpose of being interviewed. That Christopher in the presence of his attorney indicated that he was at The Mohegan Sun Casino on Sunday, March 1, 1998, and Christopher gave Affiant Coleman a photo copy of a Win/Loss Statement for Account 012152278, which indicated that Christopher started playing black jack at 1557 hours and played for one hour and thirty eight minutes (01:38). That Christopher also ate at one of the restaurants at 1809 hours, at the Mohegan Sun Casino. Christopher also verbally stated that he stopped at a Dunkin' Donut in Putnam, CT before arriving home at 109 County Rd., Eastford, CT at 1930 hours. That Christopher further stated he put blinds up on his windows at home and then at exactly at 2000 hours, he turned on his television set and watch a movie called 'Contact' starring Jodie Foster. That Christopher Cournoyer orally stated that he subscribed to Charter Communications and that he did not have order pay per view that day.

**That on Wednesday, March 11, 1998, I contacted Charter Communications Cable company. That Charter Communication services County Rd., in Eastford. That a representative for Charter Communications stated that in order to view the movie 'Contact', the cable subscriber would have had to call Charter Communications and order 'Contact' on pay per view.**

That on Saturday, March 14, 1998, Joseph Vancelette met the Affiant at Troop 'C' in Tolland and was shown a photo lineup of eight (8) similar looking white males to include Christopher Cournoyer. That Joseph Vancelette

selected photo #6 of Christopher Cournoyer as the person who was the driver in the red Grand Prix that chased him and pointed a semi-automatic handgun at him. That Joseph Vancelette also stated after he selected the photo #6, that he observed Christopher Cournoyer walk into the lobby at Troop 'C' in Tolland, CT with his attorney on Wednesday, March 11, 1998.

**That based on the Affiants training and experience, the Affiants have knowledge that when guns are used in the commission of a crime, the control of the guns are usually maintained by the perpetrators and that the guns are not usually disposed of. That criminals don't always dispose guns used during the commission of a crime and keep the guns in their homes, cars or on their persons.**

**That affiant Coleman spoke with the owner of 109 County Rd., Eastford, CT and stated that since February 1998, he has been renting to Christopher Cournoyer.**

Defendants' Motion for Summary Judgment (Doc. No. 35) ("Defendants' Motion"), at Tab A.

Both the affidavit for the gym at 962 Riverside Drive, Thompson, CT, and the affidavit for 220 South Main Street, Putnam, CT, are substantially similar to the above-quoted language, and the differences are not material to the court's analysis. All the search warrants were signed by a judge of the Connecticut Superior Court on April 18, 1998.

Nothing of particular evidentiary value was found at Scott's home, at the gym, or in Christopher's locked room at the home of his parents. However, at Christopher's home in Eastford, Shaw and Coleman located several different types of ammunition and a shoulder holster, but no gun. The shoulder holster and the ammunition were seized as evidence.

On March 21, 1998, Coleman interviewed Ronald once more and obtained a third statement from him.  This time Coleman was told that Joseph picked up his brother Ronald at about 10:00 a.m. on the morning in question to play football.  Ronald stated that the pair, along with their friend Alan Stately, went to a school in Putnam around 3:30 p.m. to play basketball.  Coleman was told that the three men played basketball until around 5:30 or 6:00 p.m.  After leaving the school, Ronald went to Scott Cournoyer's house to collect between $800 and $1,000 for a four-wheel motorbike sold to him by Alan Stately.  Coleman was told that Stately was present in Joseph's car at the time Ronald was dropped off at Scott Cournoyer's house.  Ronald told Coleman that it was just getting dark when he first arrived at Scott Cournoyer's house.  He told Coleman that it got dark while he was waiting for his brother to return, and that, although it felt like forever, it was probably only about thirty or forty minutes until the red Pontiac Grand Prix first appeared.

On March 24, 1998, Coleman interviewed Christopher Cournoyer's landlord, Thomas Lynch.  Lynch told Coleman that he rented a house at 109 County Road in Eastford, Connecticut to Christopher and his wife Rachael.  Lynch told Coleman that when Christopher moved into the house on February 21, 1998, there were blinds up on all of the windows except two.  Lynch told Coleman that he went to Wal-Mart in Windham, Connecticut and purchased

23

blinds for the two windows from which they were missing.  Lynch
stated that he gave the blinds to Christopher and that he was
"pretty positive" that the blinds were put up before March 1,
1998.

On March 24, 1998, Coleman served the search warrant he had
obtained earlier on Charter Communications Cable, seeking the
cable records for Christopher Cournoyer's residence for the
months of February and March, 1998.  Coleman wanted to verify the
accuracy of Christopher's statement about his whereabouts and
activities on the evening of March 1, 1998.  According to the
seized records, the movie that Christopher claimed to have
watched on HBO was showing only on pay-per-view on March 1, 1998.
The records showed that Christopher had not ordered pay-per-view
on March 1, 1998.  Richard Elwell, the Charter Communications
Cable manager, told Coleman that the only way Christopher could
have seen that movie was to order pay-per-view and the records
indicated that he did not do so.

Based on the information Coleman had collected, he drafted
an arrest warrant application for Christopher Cournoyer on
Friday, April 3, 1998.  Coleman was the sole affiant on the
application for the arrest warrant.  Apart from minor, non-
substantive differences, the affidavit in support of the search
warrant for 109 County Road, Eastford, Connecticut is the same
except the portions of the language quoted above that are in bold

24

type do not appear in the affidavit in support of the application

for the arrest warrant.  In addition, the arrest warrant

affidavit contains the following two paragraphs which do not

appear in the search warrant affidavit for 109 County Road,

Eastford, Connecticut:

> That on Tuesday, March 24, 1998, the Affiant served a
> search and seizure warrant at Charter Communication in
> Windham, CT for **Christopher Cournoyer's** cable records for
> the months of February and March.  That Charter
> Communication records indicates that **Christopher
> Cournoyer** did not order the movie "Contact" on 03-01-98.
> That Richard Elwell the Customer Service Manager of
> Charter Communications indicated to the Affiant, that the
> movie "Contact" was only playing on pay-per-view and that
> the only way to view the movie is to order the movie.
>
> That based on the aforementioned facts and circumstances,
> the Affiant believes probable cause exist that
> **Christopher Cournoyer** was driving the red, 1998, Pontiac
> Grand Prix, when Ronald Vancelette was shot in the town
> onf Ashford, Ct on 03-01-98.  That the Affiant is
> requesting that an arrest warrant be issued for
> **Christopher Cournoyer** DOB 06-21-71, charging him with
> crimes committed in violation of the Connecticut General
> Statutes.

The arrest warrant was signed by a judge of the Connecticut

Superior Court on Monday, April 6, 1998.  Christopher was charged

with Conspiracy to Commit Murder, in violation of Connecticut

General Statutes §§ 53a-48 and 53a-54, with Conspiracy to Commit

Assault in the First Degree, in violation of Connecticut General

Statutes §§ 53a-48 and 53a-59, and with Kidnapping in the First

Degree With a Firearm, in violation of Connecticut General

Statutes § 53a-92a.  Christopher was arrested by Connecticut

State Police Trooper Aiello on Tuesday, April 7, 1998.

Eventually, a jury convicted Scott for the March 1, 1998 kidnapping and shooting of Ronald.  All charges against Christopher were dismissed.

## II.  LEGAL STANDARD

A motion for summary judgment may not be granted unless the court determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the moving party as a matter of law.  Fed. R. Civ. P. 56(c).  See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1223 (2d Cir. 1994).  Rule 56(c) "mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex Corp., 477 U.S. at 322.

When ruling on a motion for summary judgment, the court must respect the province of the jury.  The court, therefore, may not try issues of fact.  See, e.g., Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Donahue v. Windsor Locks Bd. of Fire Comm'rs, 834 F.2d 54, 58 (2d Cir. 1987); Heyman v. Commerce & Indus. Ins. Co., 524 F.2d 1317, 1319-20 (2d Cir. 1975).  It is well-established that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of the judge."  Anderson,

26

477 U.S. at 255.  Thus, the trial court's task is "carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them.  Its duty, in short, is confined . . . to issue-finding; it does not extend to issue-resolution."  <u>Gallo</u>, 22 F.3d at 1224.

Summary judgment is inappropriate only if the issue to be resolved is <u>both</u> genuine <u>and</u> related to a material fact. Therefore, the mere existence of <u>some</u> alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment.  An issue is "genuine . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  <u>Anderson</u>, 477 U.S. at 248 (internal quotation marks omitted).  A material fact is one that would "affect the outcome of the suit under the governing law." <u>Anderson</u>, 477 U.S. at 248.  As the Court observed in <u>Anderson</u>: "[T]he materiality determination rests on the substantive law, [and] it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs."  <u>Id.</u> Thus, only those facts that <u>must</u> be decided in order to resolve a claim or defense will prevent summary judgment from being granted.  When confronted with an asserted factual dispute, the court must examine the elements of the claims and defenses at issue on the motion to determine whether a resolution of that dispute could affect the disposition of any of those claims or

27

defenses.  Immaterial or minor facts will not prevent summary

judgment.  See Howard v. Gleason Corp., 901 F.2d 1154, 1159 (2d

Cir. 1990).

When reviewing the evidence on a motion for summary

judgment, the court must "assess the record in the light most

favorable to the non-movant and . . . draw all reasonable

inferences in its favor."  Weinstock v. Columbia Univ., 224 F.3d

33, 41 (2d Cir. 2000)(quoting Del. & Hudson Ry. Co. v. Consol.

Rail Corp., 902 F.2d 174, 177 (2d Cir. 1990)).  Because

credibility is not an issue on summary judgment, the non-movant's

evidence must be accepted as true for purposes of the motion.

Nonetheless, the inferences drawn in favor of the non-movant must

be supported by the evidence.  "[M]ere speculation and

conjecture" is insufficient to defeat a motion for summary

judgment.  Stern v. Trs. of Columbia Univ., 131 F.3d 305, 315 (2d

Cir. 1997)(quoting W. World Ins. Co. v. Stack Oil, Inc., 922 F.2d

118, 121 (2d Cir. 1990)).  Moreover, the "mere existence of a

scintilla of evidence in support of the [non-movant's] position"

will be insufficient; there must be evidence on which a jury

could "reasonably find" for the non-movant.  Anderson, 477 U.S.

at 252.

Finally, the nonmoving party cannot simply rest on the

allegations in its pleadings because the essence of summary

judgment is to go beyond the pleadings to determine if a genuine

issue of material fact exists.  See Celotex Corp., 477 U.S. at
324.  "Although the moving party bears the initial burden of
establishing that there are no genuine issues of material fact,"
Weinstock, 224 F.3d at 41, if the movant demonstrates an absence
of such issues, a limited burden of production shifts to the non-
movant, which must "demonstrate more than some metaphysical doubt
as to the material facts, . . . [and] must come forward with
specific facts showing that there is a genuine issue for trial."
Aslanidis v. U.S. Lines, Inc., 7 F.3d 1067, 1072 (2d Cir.
1993)(quotation marks, citations and emphasis omitted).
Furthermore, "unsupported allegations do not create a material
issue of fact."  Weinstock, 224 F.3d at 41.  If the non-movant
fails to meet this burden, summary judgment should be granted.

    "[W]hen both parties move for summary judgment, asserting
the absence of any genuine issues of material fact, a court need
not enter judgment for either party . . . .  Rather, each party's
motion must be examined on its own merits, and in each case all
reasonable inferences must be drawn against the party whose
motion is under consideration."  Morales v. Quintel Entm't, Inc.,
249 F.3d 115, 121 (2d Cir. 2001).

**III. DISCUSSION**

   **A.   First Count: Section 1983 Claims**

    The defendants argue that they are entitled to summary
judgment on all the plaintiff's claims because they had probable

29

cause to search the plaintiff's residences and business and to arrest him, or, alternatively, that they are entitled to qualified immunity.  The plaintiff argues that he is entitled to summary judgment on all his claims because the defendants unlawfully searched his residences and business and arrested him without probable cause.  The plaintiff contends that the search and the arrest warrants were based on affidavits that contained false statements and/or the following material omissions of fact, as follows:

(1) Ronald failed to identify the plaintiff from a photographic array containing Christopher's picture on March 14, 1998;

(2) The defendants knew that the plaintiff never had long hair or a goatee from his statements and from easily verifiable sources;

(3) The photograph of Christopher that Joseph identified on March 14, 1998 was the same one Coleman took on March 11, 1998 at Troop C when Joseph observed Christopher arrive with his attorney;

(4) The sun set at 5:38 p.m. in Thompson, Connecticut on March 1, 1998;

(5) Oxford, Massachusetts is 57 miles from the Mohegan Sun Casino in Uncasville, Connecticut;

(6) Ronald stated in a sworn affidavit that while

hitchhiking, just before dark on March 1, 1998, he was picked up by the red Grand Prix containing the suspects;

(7) Documentation conclusively established that Christopher was at the Mohegan Sun Casino at the time of the incident;

(8) Joseph stated that it was after 5:45 p.m. when he was chased on the highway by a man he later identified as Christopher;

(9) Joseph stated that it was after 5:45 p.m. when he drove back and could not find his brother Ronald.[3]

### 1.    Probable Cause

Probable cause exists "when the arresting officer has knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed . . . a crime." Escalera v. Lunn, 361 F.3d 737, 743 (2d Cir. 2004). "[O]nly the probability, and not a prima facie showing, of criminal activity is the standard of probable cause." Illinois v. Gates, 462 U.S. 213, 235 (1983) (internal citations omitted).

"The fact that an innocent explanation may be consistent

---

[3] The plaintiff also contends that the affidavit should have stated that Joseph's opportunity to observe the driver was limited by the fact that the shooting occurred at night and by the fact that Joseph observed the driver while they were both traveling at high rates of speed.  However, these points are apparent from the facts set forth in the affidavits.

with the facts alleged . . . does not negate probable cause."
U.S. v. Fama, 758 F.2d 834, 838 (2d Cir. 1985).  Moreover, "an
officer's failure to investigate an arrestee's protestations of
innocence generally does not vitiate probable cause."  Panetta v.
Crowley, No. 02-7275-cv, 2006 WL 2383223, at *6 (2d Cir. Aug. 18,
2006).  "Nor does it matter that an investigation might have cast
doubt upon the basis for the arrest."  Curley v. Village of
Suffern, 268 F.3d 65, 70 (2d Cir. 2001).  Probable cause does not
require that an arresting officer "believe with certainty that
the arrestee will be successfully prosecuted."  Id.

### a.  Probable Cause for Searches

Here, when the search warrants were obtained, Coleman and
Shaw had amassed information sufficient to support a finding of
probable cause.  First, Christopher's wife, Rachael, provided
police with a signed, written statement detailing communications
she had with Christopher, which communications suggested that he
had been involved in the shooting.  Before the date of the
shooting, Christopher had told her that Scott's home and the gym
had been broken into; he identified certain people he suspected,
and told her that "something was going to be done to them."
(Defendants' Motion, at Tab C).  According to Rachael,
Christopher called her and told her that "[s]omething bad
happened."  Id.  When Rachael asked him if he or Scott had "beat
someone up," he replied, "no, but it's more [than] that."  Id.

And, when she asked him if the person was still alive,
Christopher said, "I can't tell you."  Id.  She also informed
police that Christopher told her that he was using a calling
card, and that he was not using a car phone because it could be
traced.  Rachael reported that Christopher told her that he and
Scott were "far away" and that he could not tell her where he
was.  Id.  Rachael also stated that Christopher told her that he
and Scott were going to go to Italy, but that he did not know if
they would be able to obtain false passports.  According to
Rachael, Christopher eventually admitted to her that he and Scott
had been hiding out at the Crowne Plaza Hotel in Worcester,
Massachusetts.

     In addition, Christopher was listed as the second driver on
the rental contract for a red, 1998 Pontiac Grand Prix.  Ronald
informed police that he was shot while attempting to escape from
a red car of that model and Joseph claimed that he was chased by
a late-nineties model, red Grand Prix.  According to Pineo,
Christopher came to the Enterprise Rental Cars office at
approximately 10:00 a.m. on March 2, 1998 and paid the balance of
the rental bill.  When Coleman questioned Christopher about
whether he had dropped off the rental car, Christopher denied it.
When Coleman informed him that Scott had told Coleman that it was
Christopher who had dropped off the car and told him that one of
the brothers had to be lying, Christopher answered, "A lie is not

33

a lie until you swear to it." (Coleman Aff. ¶ 21). Christopher did not swear to the statements he made to Coleman during this conversation.

Police also attempted to verify Christopher's explanation of his whereabouts and activities on March 1, 1998. Much of the information provided was later contradicted by other sources. For example, Christopher informed Coleman that he watched the movie "Contact," which was aired on HBO beginning at 8:00 p.m., and stated that he did not order any pay-per-view programming that night. However, on March 11, 1998, Charter Communications Cable informed police that "Contact" had only been available via pay-per-view.

While Christopher presented documentation supporting his contention that he was at the Mohegan Sun Casino until 6:09 p.m., accepting that contention does not resolve the question of whether Christopher was involved in the shooting, which was reported at 7:40 p.m. The prosecution's case would have been weakened by inconsistencies in Joseph and Ronald's statements, Ronald's inability to identify Christopher, and the fact that Joseph's identification of Christopher may have been tainted, but that is immaterial to a determination of probable cause. Considering all of the information obtained by police, Coleman and Shaw had adequate evidence to support a finding of probable cause for the issuance of search warrants for Christopher's

34

residences and business.

### b.  Probable Cause to Arrest

The evidence available at the time the search warrants were issued also supports a finding of probable cause to arrest.  In addition, in executing the search warrants and in conducting further investigation subsequent to March 18, 1998, the police discovered additional evidence to support a finding of probable cause to arrest Christopher.

Christopher told Coleman that he put up blinds in his apartment before watching "Contact."  On March 24, 1998, Christopher's landlord informed police that he was "pretty positive" that the blinds had been hung before March 1, 1998. (Coleman Aff., at ¶ 28).  Also, on March 24, 1998, police verified with the cable company that Christopher had not ordered pay-per-view programming on March 1, 1998, further calling into question his assertion that he had watched "Contact."  These inconsistencies would support a conclusion that Christopher had created a false alibi.

Furthermore, in searching Christopher's home in Eastford, Connecticut pursuant to the search warrant issued for that residence, police discovered several different types of ammunition and a shoulder holster.

Based on the foregoing, there was information "sufficient to warrant a person of reasonable caution in the belief that the

person to be arrested [had] committed . . . a crime." <u>Escalera</u>,
361 F.3d at 743.

### 2. **Qualified Immunity**

Qualified immunity is an affirmative defense for which the
defendant bears the burden. <u>Gomez v. Toledo</u>, 446 U.S. 635, 640
(1980). "To establish the [qualified immunity] defense at the
summary judgment stage, the officers must show upon facts that
are undisputed either that [their] conduct did not violate
clearly established rights which a reasonable person would have
known, or that it was objectively reasonable to believe that
[their] acts did not violate these clearly established rights."
<u>Soares v. State of Conn.</u>, 8 F.3d 917, 920 (2d Cir. 1993)
(internal quotation marks and citation omitted). Courts use the
same standard for qualified immunity when dealing with either
arrests or searches. <u>See Malley v. Briggs</u>, 475 U.S. 335, 344 n.6
(1986) ("the distinction between a search warrant and an arrest
warrant would not make a difference in the degree of immunity
accorded the officer who applied for the warrant.").

At all relevant times, the plaintiff had "a clearly
established right not to be arrested or prosecuted without
probable cause." <u>Soares</u>, 8 F.3d at 920 (citing <u>Golino v. City of
New Haven</u>, 950 F.2d 864, 870 (2d Cir. 1991)). This right can be
particularized as "the right to be free from an arrest based on a
warrant that would not have been issued if the officer seeking

36

the warrant had disclosed to the issuing [judge] information
within the officer's knowledge that negated probable cause."
Brown v. D'Amico, 35 F.3d 97, 99 (2d Cir. 1994).

"A plaintiff can demonstrate that this right was violated
where the officer submitting the probable cause affidavit
knowingly and intentionally, or with reckless disregard for the
truth, made a false statement in his affidavit or omitted
material information, and that such false or omitted information
was necessary to the finding of probable cause."  Soares, 8 F.3d
at 920 (internal quotations marks and citation omitted).  An
"officer may not omit circumstances that are critical to the
evaluation of probable cause."  Brown, 35 F.3d at 99.  "Where an
officer knows, or has reason to know, that he has materially
misled a magistrate on the basis for a finding of probable cause,
.  .  . the shield of qualified immunity is lost."  Velardi v.
Walsh, 40 F.3d 569, 573 (2d Cir. 1994) (citation
omitted)(utilizing standard in context of search warrants);
Golino, 950 F.2d at 871 (applying same standard in the context of
an arrest warrant).

> In reviewing such cases on qualified immunity motions, a
> court should put aside allegedly false material, supply
> any omitted information, and then determine whether the
> contents of the corrected affidavit would have supported
> a finding of probable cause.  If probable cause remains,
> no constitutional violation of the plaintiff's Fourth
> Amendment rights has occurred.  However, if the corrected
> affidavit does not support an objective finding of
> probable cause, then the court should conclude that
> material factual disputes prevent summary judgment for

37

defendant on the qualified immunity defense.
Soares, 8 F.3d at 920-21 (internal quotation marks and citations
omitted).

The defendants would also be entitled to qualified immunity
if "reasonably competent police officers could have disagreed as
to whether there was probable cause" to search the plaintiff's
residences and business or to arrest the plaintiff. Ricciuti v.
New York City Transit Auth., 124 F.3d 123, 128 (2d Cir. 1997)
(citing Golino, 950 F.2d at 870). The issue is "whether a
reasonably-trained officer in [the defendants'] position would
have known that his affidavit failed to establish probable cause
and that he should not have applied for the warrant." Malley v.
Briggs, 475 U.S. 335, 345 (1986). The officer "will not be
immune if, on an objective basis, it is obvious that no
reasonably competent officer could have concluded that a warrant
should issue; but if officers of reasonable competence could
disagree on this issue, immunity should be recognized." Malley,
475 U.S. at 341.

"Whether an official protected by qualified immunity may be
held personally liable for an alleged unlawful official action
generally turns on the 'objective legal reasonableness' of the
action  .  .  .  assessed in light of the legal rules that were
'clearly established at the time it was taken.'" Cartier v.
Lussier, 955 F.2d 841, 843 (2d Cir. 1992) (quoting Anderson v.

Creighton, 483 U.S. 635, 639 (1992); Harlow v. Fitzgerald, 457
U.S. 800, 818-19 (1982)).  "In the context of an allegedly
unconstitutional arrest, the objective reasonableness standard
bars the defense of qualified immunity 'only where the warrant
application is so lacking in indicia of probable cause as to
render official belief in its existence unreasonable.'" Cartier
v. Lussier, 955 F.2d 841, 843 (2d Cir. 1992) (quoting Malley v.
Briggs, 475 U.S. 335, 344-45 (1982)).  See also Willocks v.
Dodenhoff, 110 F.R.D. 652, 655 (D. Conn. 1986) (applying same
standard to allegedly unlawful search warrant).

        In this case, the court has concluded that probable cause
existed for both the searches and the arrest.  However, assuming
arguendo that there was not probable cause, Coleman and Shaw are
entitled to qualified immunity for the searches and the arrest
because "reasonably competent police officers could have
disagreed as to whether there was probable cause." Ricciuti, 124
F.3d at 128.  In the search warrant affidavits and in the arrest
warrant affidavit, there was considerable evidence that would
allow a reasonable person to conclude that Christopher was
involved in the criminal activity on March 1, 1998.

        The plaintiff points out that there are certain omissions in
the affidavits.  For example, in the search warrant affidavits
and in the arrest warrant affidavit, there appeared no discussion
of the matching signatures on Christopher's receipts from the

Mohegan Sun Casino.  However, the affidavits state that
Christopher provided a win/loss statement to police and that he
ate at a restaurant at the casino at 6:09 p.m.  A reasonable
officer could conclude that the omission as to the signatures
matching was immaterial in light of those disclosures.  Also, in
the affidavits, there is information about Joseph's potentially
tainted identification of Christopher, but the affidavits do not
state that Joseph actually identified a photograph of Christopher
taken the same day that Joseph saw Christopher at the police
station.  Given the fact that the court was alerted to the
problem of the tainted identification, and that substantial other
evidence was presented, a reasonable officer could conclude that
this omission was not material.  The affidavits also did not
indicate that Ronald could not identify Christopher or that
Joseph described Christopher as possibly having a goatee or a
moustache, when Christopher did not.  In addition, the plaintiff
points out that Coleman and Shaw did not detail Joseph and
Ronald's statements as to when particular events occurred.
However, a reasonable officer could conclude that these and
another omissions were not material to a finding of probable
cause, given the substantial other evidence supporting a finding
of probable cause.

     Furthermore, Coleman and Shaw did not include all of the
available <u>inculpatory</u> evidence in their affidavits.

Significantly, they failed to include Rachael's signed statement, where she provided substantial evidence in support of probable cause.  They also did not include Christopher's statements to Coleman where Christopher denied having brought the car back to Enterprise Rental Cars.  Given these omissions, the facts do not support a finding that Coleman and Shaw knew or had reason to know that they "materially misled a magistrate."  <u>Velardi</u>, 40 F.3d at 573.

### B.    Second Count:  State Law Claims

The plaintiff's remaining claims are state law claims.  "The district courts may decline to exercise supplemental jurisdiction over a [state law] claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction."  28 U.S.C.A. § 1367(c)(3).  "[P]endent jurisdiction is a doctrine of discretion, not of plaintiff's right."  <u>United Mine Workers of Am. v. Gibbs</u>, 383 U.S. 715, 726 (1966).

While dismissal of the state law claims is not mandatory, <u>Carnegie-Melon Univ. v. Cohill</u>, 484 U.S. 343, 350 n.7 (1988), when "all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine--judicial economy, convenience, fairness, and comity--will point toward declining to exercise jurisdiction over the remaining state-law claims."  <u>Id.</u>  Accordingly, the court declines to exercise supplemental jurisdiction over the

41

plaintiff's state law claims.

IV.  **CONCLUSION**

    For the reasons set forth above, Defendants' Motion for
Summary Judgment (Doc. No. 35) is hereby GRANTED, and the
Plaintiff's Motion for Summary Judgment (Doc. No. 39) is hereby
DENIED.  Judgment shall enter in favor of the defendants on the
First Count (the plaintiff's claim brought pursuant to 42 U.S.C.
§ 1983), and the Second Count (the plaintiff's state law claims)
is hereby dismissed without prejudice.

    The Clerk shall close this case.

    It is so ordered.

    Dated this 27th day of September, 2006, at Hartford,
Connecticut.


                    _____/s/AWT_____
                         Alvin W. Thompson
                    United States District Judge